**MICRON TECHNOLOGY, INC.,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

and

**LG Semicon America, Inc. and LG Semicon, Co., Ltd. (now known as Hyundai Electronics America, Inc. and Hyundai Electronics Industries Co., Ltd.), Defendants–Cross Appellants.**

No. 00–1058, 00–1060.

United States Court of Appeals,
Federal Circuit.

DECIDED: March 7, 2001.

---

Michele D. Lynch, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief was David M. Cohen, Director. Of counsel were Velta A. MeInbrencis, Department of Justice; and John D. McInerney, Berniece A. Browne, and Patrick V. Gallagher, Jr., Attorneys, Department of Commerce, of Washington, DC.

Michael P. House, Kaye, Scholer, Fierman, Hays & Handler, LLP, of Washington, DC, argued for defendants-cross appellants. With him on the brief was Raymond P. Paretzky.

Joseph W. Dorn, King & Spalding, of Washington, DC, for amicus curiae, The Southern Tier Cement Committee. With him on the brief were Michael P. Mabile, and Dean A. Pinkert.

Herbert C. Shelley, Steptoe & Johnson LLP, of Washington, DC, for amicus curiae SKF USA, Inc. With him on the brief was Alice A. Kipel.

Neil R. Ellis, Powell, Goldstein, Frazer & Murphy LLP, of Washington, DC, for amicus curiae LG Semicon Ameica, Inc. and LG Semicon Co, Ltd., etc. With him on the brief were Elizabeth C. Hafner, and Susan M. Mathews.

Kathleen W. Cannon, Collier Shannon Scott, PLLC, of Washington, DC, for amici curiae Allegheny Ludlum Corp., et al. With her on the brief were David A. Hartquist, Paul C. Rosenthal, and Michael J. Coursey.

Before CLEVENGER, SCHALL, and DYK, Circuit Judges.

DYK, Circuit Judge.

## DECISION

This case presents important questions concerning the interpretation of the 1994 amendments to the Tariff Act of 1930 ("Act"), codified in the United States Code in Chapter 4 of Title 19. We conclude that the amendments are ambiguous as to the

Gilbert B. Kaplan, Hale and Dorr, LLP, of Washinton, DC, argued for plaintiff-appellant. With him on the brief were Michael D. Esch, Paul W. Jameson, and Cris R. Revaz.

scope of the indirect selling expenses to be deducted under 19 U.S.C. § 1677a(d)(1)(D) (1999).[1] Because we also conclude that the Department of Commerce's interpretation of that provision is reasonable, we defer to that interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Finally, we conclude that the plain text of the amended statute requires the Department of Commerce ("Commerce") to deduct the selling expenses enumerated in 19 U.S.C. § 1677a(d) from the starting price of constructed export price sales before making a level of trade comparison under 19 U.S.C. § 1677b(a)(7)(A). Accordingly, we affirm in part and reverse in part.

## STATUTORY BACKGROUND

Resolution of this appeal requires an understanding of the antidumping statute, which was significantly amended by the Uruguay Round Agreements Act, Pub. L. No. 103–465, 108 Stat. 4809 (1994) ("URAA"). The URAA applies to administrative reviews initiated after January 1, 1995, and therefore governs this appeal. *Torrington Co. v. United States,* 68 F.3d 1347, 1352 (Fed.Cir.1995).

Under the current antidumping statute, Commerce is required to impose antidumping duties on imported merchandise that is being sold, or is likely to be sold, in the United States at less than fair value to the detriment of a domestic industry. 19 U.S.C. § 1673. "The purpose underlying the antidumping laws is to prevent foreign manufacturers from injuring domestic industries by selling their products in the United States at less than 'fair value,' i.e., at prices below the prices the foreign manufacturers charge for the same products in their home markets." *Torrington Co.,* 68 F.3d at 1352. The amount of the duty to be imposed, otherwise known as the "dumping margin," is the amount by which the price charged for the subject merchan-

dise in the home market (the "normal value") exceeds the price charged in the United States (the "U.S. price"). 19 U.S.C. §§ 1673, 1677(25)(A). The U.S. price is calculated by using one of two statutorily-prescribed methodologies—export price ("EP") or constructed export price ("CEP"). 19 U.S.C. § 1677a(a)-(b).

In order to make a fair comparison, certain adjustments must be made to the U.S. price and the normal value. Such adjustments are made in order to "reconstruct the price at a specific, 'common' point in the chain of commerce, so that value can be fairly compared on an equivalent basis." *Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1568 (Fed.Cir.1994) (quoting *Smith–Corona Group v. United States,* 713 F.2d 1568, 1572 (Fed.Cir.1983)).

The two adjustments involved here are directed to the problem posed by sales to affiliated entities. When an exporter makes a sale to an affiliated entity—for example, a wholly or partly owned distributor—the price is necessarily suspect. The risk is that an artificially low price may be charged to the affiliated distributor in the home market and an artificially high price charged to the affiliated distributor in the United States market. The consequence in each case is that a lower countervailing duty (or no duty at all) would be payable.

*Constructed Export Price Deductions Under 19 U.S.C. § 1677a(d)(1)*

When the foreign producer or exporter sells directly to an *unaffiliated* purchaser in the United States, Commerce uses EP as the U.S. price for purposes of the comparison. 19 U.S.C. § 1677a(a). However, where a sale is made by a foreign producer or exporter to an *affiliated* purchaser in the United States, the statute provides for use of CEP as the United States price for purposes of the comparison. 19 U.S.C. § 1677a(b). All of the sales at issue in this appeal are CEP sales.

---

**1.** All statutory references are to the 1999 version of the United States Code, unless otherwise indicated.

To determine the U.S. price for both EP and CEP sales, Commerce starts with the first sale price to an unaffiliated purchaser ("starting price") and makes certain upward and downward adjustments enumerated in 19 U.S.C. § 1677a(c). Further, in subsection (d) the statute sets forth specific bases for additional deductions which apply only to CEP sales. Of particular relevance here are the deductions of subsection (d)(1), which provides:

[T]he price used to establish constructed export price shall also be reduced by— (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—

(A) commissions for selling the subject merchandise in the United States;
(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
(C) any selling expenses that the seller pays on behalf of the purchaser; and
(D) *any selling expenses not deducted under subparagraph (A), (B), or (C).*

19 U.S.C. § 1677a(d) (emphasis added). The first issue in this case involves the subsection (d)(1)(D) deductions.

Here the parties differ over the class of expenses included within subsection (d)(1)(D). Under Commerce's theory, the objective of the subsection (d)(1)(D) deductions is to adjust the price of the first sale by the U.S. affiliate to an unaffiliated purchaser so that it corresponds as closely as possible to the EP, i.e., so that CEP and EP reflect the same level of trade, and comparable comparisons using either EP or CEP can be made to normal value. As

stated in Commerce's post-URAA regulation which formalized the methodology at issue here:

In establishing constructed export price under section 772(d) of the Act [19 U.S.C. § 1677a(d)], the Secretary [of Commerce] will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid.

19 C.F.R. § 351.402(b).[2] As Commerce stated in its Preamble to this regulation, the expenses at issue are those expenses "incurred between importation and resale" but not pre-importation expenses. *Antidumping Duties; Countervailing Duties;* Final Rule, 62 Fed. Reg. 27,296, 27,351 (May 19, 1997) ("Preamble"). *See also Color Picture Tubes from Japan,* 62 Fed. Reg. 34,201, 34,207 (June 25, 1997) (final admin. review). Thus, in Commerce's view general selling expenses, such as inventory costs, applicable to sales generally and not specifically related to United States sales to an unaffiliated purchasers should not be deducted.

On the other hand, appellant Micron Technology, Inc. ("Micron") urges on this appeal that the provision, on its face, provides for the deduction of "any" indirect selling expenses, and that Commerce's deductions were too limited. Micron contends that the statute obligates Commerce to deduct not only those expenses specifically associated with the sale to the unaffiliated customer in the United States, but also that portion of the indirect selling expenses incurred abroad that is allocable to United States sales.

*Level of Trade Adjustment*

The statute further requires Commerce to establish normal value "to the extent practicable, at the same level of trade as the export price or constructed export

---

**2.** The regulations adopted by Commerce following the administrative review at issue here are not, of course, retroactive. *See* 19 C.F.R. § 351.701; *see also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."). Nonetheless, the post-URAA regulations and the accompanying Preamble are relevant to this appeal because they fully explain the rationale for and structure of Commerce's antidumping methodologies.

price." 19 U.S.C. § 1677b(a)(1)(B)(i). Neither the statute nor the accompanying Statement of Administrative Action ("SAA"), H.R. Doc. No. 103–316, 103rd Cong., 2d Sess. (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040,[3] defines the phrase "same level of trade." However, we understand the term to mean comparable marketing stages in the home and United States markets, *e.g.*, a comparison of wholesale sales in Korea to wholesale sales in the United States. *See* 19 C.F.R. § 351.412(c)(2) ("The Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent)."). This provision ensures, for example, that a normal value wholesale price will not be compared to a United States CEP retail price.

When Commerce is unable to find sales in the foreign market at the same level of trade as the sales in the United States, it will compare sales in the United States and foreign markets at a different level of trade. In such cases, the antidumping statute requires Commerce to increase or decrease the normal value to account for the difference in the level of trade, if that difference:

(i) involves the performance of different selling activities; and

(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.

19 U.S.C. § 1677b(a)(7)(A); *see also* 19 C.F.R. § 351.412(a-b).

In some instances, the level of trade in the home market will constitute a more advanced stage of distribution than the level of trade in the United States, yet Commerce will lack sufficient data regarding the sales in the two markets to make a level of trade adjustment, that is, it will be unable to determine how much to reduce

the foreign sale price to arrive at a price comparable to the U.S. price. In those cases, the statute provides for the award of a "constructed export price offset" ("CEP offset"), i.e., a reduction in normal value equal to "the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product..." 19 U.S.C. § 1677b(a)(7)(B). The effect is to reduce the price of the more advanced level of trade by "indirect selling expenses" that have been included in the price on the apparent theory that such costs would not have been incurred if the sale had been made on a less advanced level of trade. However, the "CEP offset" may not exceed "the amount of such expenses for which a deduction is made under section 1677a(d)(1)(D)." *Id.*

Here the parties disagree over whether the amended statute requires Commerce to deduct the selling expenses enumerated in 19 U.S.C. § 1677a(d) from CEP before making the level of trade comparison. According to Commerce, "[t]he statute directs the Department to determine normal value at the LOT [level of trade] of the CEP, which includes any CEP deductions under section 772(d)." Preamble, 62 Fed. Reg. at 27,371. Commerce has formalized this interpretation of the statute in a regulation which provides, in pertinent part, that "[t]he Secretary [of Commerce] will identify the level of trade based on: ... [i]n the case of constructed export price, the starting price, as adjusted under section 772(d) of the Act." 19 C.F.R. § 351.412(c)(1). Appellant Micron argues that the statute does not authorize Commerce to deduct the selling expenses at issue before making the level of trade comparison, and that Commerce's methodology is not in accordance with law.

## FACTUAL BACKGROUND

This particular case involves the determination of dumping margins for imports

---

**3.** As noted below, the SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

of dynamic random access memory semiconductors ("DRAMS") from the Republic of Korea ("Korea") by LG Semicon Co., and its United States subsidiary, LG Semicon America, Inc., (collectively, "LG Semicon").

Appellant Micron, a United States manufacturer of DRAMS, petitioned Commerce on April 22, 1992, for an antidumping investigation to determine whether Korean producers of DRAMS were selling the subject merchandise in the United States at less than fair value.

Following its antidumping investigation, Commerce made an affirmative determination of sales at less than fair value and accordingly published an antidumping order on DRAMS from Korea in May, 1993. *Antidumping Duty Order and Amended Final Determination: Dynamic Random Access Memory Semiconductors of One Megabit and Above from the Republic of Korea,* 58 Fed. Reg. 27,520 (May 10, 1993). At the request of Micron and three respondents (including LG Semicon), Commerce initiated an administrative review of the antidumping order on June 15, 1995, covering the period of review from May 1, 1994, through April 30, 1995. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 60 Fed. Reg. 31,-447 (June 15, 995).[4] As part of this administrative review, Commerce obtained from LG Semicon data regarding the companies' direct and indirect selling expenses incurred in the United States and Korea.

On January 7, 1997, Commerce issued its final results of its administrative review, assigning a *de minimis* dumping margin. *Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea; Final Results of Antidumping Duty Administrative Review,* 62 Fed. Reg. 965, 968 (Jan. 7, 1997) ("Final Results"). Two issues in the Final Results are pertinent to this appeal.

*Constructed Export Price Deductions Under 19 U.S.C. § 1677a(d)(1)(D)*

The first issue ("Issue 1") involves Commerce's interpretation of 19 U.S.C. § 1677a(d)(1)(D), which, as noted above, mandates that the "price used to establish constructed export price shall also be reduced by any selling expenses not deducted under" the other subdivisions of subsection (d)(1). In computing the U.S. price for the subject merchandise, Commerce interpreted this provision to exclude from the deductions indirect selling expenses incurred by LG Semicon in Korea that were not directly related to sales to an unaffiliated purchaser in the United States.[5] Unfortunately, the parties to this appeal have provided us with only the sketchiest description of the types of indirect selling expenses at issue. They are said to be the rents on LG Semicon's sales offices incurred in Korea, the salaries for LG Semicon's salesmen incurred in Korea, and certain inventory carrying costs.

In deciding not to deduct these indirect selling expenses from the U.S. price, Commerce reasoned that the indirect selling expenses at issue did "not result from or bear relationship to selling activities in the United States," and accordingly it declined to deduct them. Final Results, 62 Fed. Reg. at 967.[6]

---

**4.** This was the parties' second request for an administrative review of Commerce's May, 1993, antidumping order. Following the first administrative review, Commerce assigned a dumping margin of 0.00% to LG Semicon. *Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea,* 61 Fed. Reg. 20,216, 20,-222 (May 6, 1996) (final admin. review). This appeal does not challenge the results of that review.

**5.** In its Preliminary Results, Commerce had initially deducted these indirect selling expenses from the U.S. price. *Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea,* 61 Fed. Reg. 36,029, 36,030 (July 9, 1996) (prelim. admin. review). Prior to the issuance of the Final Results, however, Commerce concluded that the amended antidumping statute barred the deduction of these expenses.

**6.** As stated above, Commerce subsequently formalized this methodology as a regulation. 19 C.F.R. § 351.402.

Micron appealed this determination to the Court of International Trade, arguing that the plain text of section 1677a(d)(1)(D) of the statute mandated that all selling expenses be deducted from the starting price. The court disagreed, noting that the statute did not define the scope of the indirect selling expenses to be deducted under 19 U.S.C. § 1677a(d)(1)(D). *Micron Tech., Inc. v. United States,* 40 F.Supp.2d 481, 485 (CIT 1999). "Because the statute is silent," the court examined Commerce's interpretation of the statute and found it to be reasonable and thus entitled to *Chevron* deference. *Id.* at 484–85.

*Level of Trade Adjustment*

The second issue ("Issue 2") involves Commerce's methodology used to conduct the level of trade analysis.[7] To assess the level of trade, Commerce first adjusted the starting price by deducting the indirect selling expenses identified above, including the deductions set forth in 19 U.S.C. § 1677a(d)(1)(D), to arrive at the U.S. price. Commerce then compared the U.S. sales to the sales in Korea (the home market) and concluded that LG Semicon's sales in Korea were at a more advanced level of trade than the sales in the United States. Because there was no basis upon which to determine what price differences existed between these two levels of trade, Commerce allowed LG Semicon a "constructed export price offset" pursuant to 19 U.S.C. § 1677(a)(7)(B). *Final Results,* 62 Fed. Reg. at 966.

Micron also appealed this determination to the Court of International Trade. On that appeal, Micron argued that the statute did not authorize Commerce to deduct the selling expenses enumerated in 19 U.S.C. § 1677a(d) from the starting price of LG Semicon's CEP sales before making the level of trade comparison. The court agreed with Micron and held that Com-

merce's methodology contravened the statute. In reaching this decision, the court relied on its earlier decision in *Borden, Inc. v. United States,* 4 F.Supp.2d 1221 (C.I.T.1998), *appeal docketed,* Nos. 99–1575, 99–1576, 2001 WL 212232 (Fed.Cir. 2001). In *Borden,* the court found "that Commerce's [level of trade] methodology in CEP cases does not comport reasonably with the current statutory scheme." *Id.* at 1241. Although the court's reasoning in *Borden* was not entirely clear, it appears that the court determined that the plain text of the statute "makes no mention of '(d)' type adjustments prior to the LOT [level of trade] analysis." *Id.* The court appears to have also found that Commerce's deduction of the selling expenses set forth in 19 U.S.C. § 1677a(d) before making the level of trade analysis automatically resulted in level of trade adjustments in every CEP case, contrary to Congressional intent. The court concluded that the statute "leaves no room for Commerce's ostensible discretion to pre-adjust for selling expenses in the United States through the automatic deduction of § 1677a(d) selling expenses," and accordingly it rejected Commerce's methodology. *Id.*

Micron timely appealed the Court of International Trade's disposition of Issue 1 to this court. LG Semicon filed a timely cross-appeal as to Issue 2.[8]

DISCUSSION

I.

*Jurisdiction*

This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(5). "When reviewing anti-dumping determinations made by Commerce, this court applies anew the standard of review applied by the Court of International Trade in its

---

7. As stated above, Commerce subsequently formalized this methodology as a regulation. 19 C.F.R. § 351.412.

8. The United States did not join in LG Semicon's cross-appeal. However, the United States did appeal and brief this issue in *Bor-*

*den, Inc. v. United States,* Nos. 99–1575, 99–1576, 2001 WL 212232. At oral argument, Micron and LG Semicon agreed that resolution of this second interpretive issue will affect the duty calculation even if we affirm the Court of International Trade on the first issue.

review of the administrative record." *F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027, 1031 (Fed.Cir.2000). In doing so, we uphold Commerce's determination unless it is "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

■ We review questions of statutory interpretation without deference. *U.S. Steel Group v. United States,* 225 F.3d 1284, 1286 (Fed.Cir.2000). In reviewing an agency's construction of a statute that it administers, this court addresses two questions as required by the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The first question is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If so, this court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If, however, Congress has not spoken directly on the issue, this court addresses the second question of whether the agency responsible for filling a gap in the statute has rendered an interpretation that "is based on a permissible construction of the statute." *Id.* This court has repeatedly recognized "Commerce's special expertise and accord[s] substantial deference to its construction of pertinent statutes." *Micron Tech., Inc. v. United States,* 117 F.3d 1386, 1394 (Fed.Cir.1997).

## II.

*Constructed Export Price Deductions Under 19 U.S.C. § 1677a(d)(1)*

Before this court, Micron argues that the plain text of 19 U.S.C. § 1677a(d)(1), the SAA, the legislative history of the statute, and the statute's purpose require the deduction from the starting price of all selling expenses related to CEP sales.

*The Language of the Statute*

Micron urges that the statutory language itself requires the deduction of all selling expenses. As noted above, subsection D provides for the deduction of "*any*

selling expenses not deducted under subparagraph (A), (B), or (C)." 19 U.S.C. § 1677a(d)(1) (emphasis added). Micron and *amici* point us to cases holding that the term "any" necessarily means "all." *See United States v. Rosenwasser,* 323 U.S. 360, 362–63, 65 S.Ct. 295, 89 L.Ed. 301 (1945) ("The use of the words 'each' and 'any' to modify 'employee' ... leaves no doubt as to the Congressional intention to include all employees within the scope of the [Fair Labor Standards] Act unless specifically excluded."); *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1481 (Fed.Cir.1997) ("The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive.").

While we agree that the word "any" necessarily includes "all," the real question here is "all of what"? We conclude that the description of the "what" in the statute is ambiguous, as the statute does not define the "selling expenses" within subsection D. We reach this conclusion for several reasons. Application of the interpretive rule of *ejusdem generis* to § 1677a(d)(1) suggests that Congress intended subsection D to encompass the same types of expenses as are included in subsections A, B and C.

As this court has previously stated:

Under the rule of *ejusdem generis,* which means "of the same kind," where an enumeration of specific things is followed by a general word or phrase, the general word or phrase is held to refer to things of the same kind as those specified.

*Sports Graphics, Inc. v. United States,* 24 F.3d 1390, 1392 (Fed.Cir.1994) (italics in original); *see generally* 2A Norman J. Singer, *Statutes and Statutory Construction,* § 47.17, at 273 (6th ed. 2000) ("Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.").

The plain text of the statute and the accompanying SAA make it clear that the

three types of expenses enumerated in 19 U.S.C. § 1677a(d)(1)(A)-(C) are limited to expenses incurred specifically with respect to sales to unaffiliated purchasers in the United States: only those "commissions for selling the subject merchandise in the United States" are deductible under subsection A; *see also* SAA at 823 (stating that commissions are deductible "only to the extent that they are incurred in the United States on sales of the subject merchandise"), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163. Subsection B sets forth a non-exhaustive list of direct selling expenses, which the SAA defines as "expenses which result from and bear a direct relationship to the particular sale in question." SAA at 823, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163. The SAA further provides that such expenses may be deducted from the constructed export price only "to the extent they are incurred after importation." *Id.* Finally, the expenses assumed by the seller on behalf of the purchaser may be deducted under subsection C "in the same manner as the direct selling expenses," i.e., only if the expenses bear a direct relationship to the sale to the unaffiliated purchaser in the United States. SAA at 824, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4164.

■ In short, the only expenses deductible under the first three subsections of 19 U.S.C. § 1677a(d)(1) are those expenses arising specifically out of the sale of the subject merchandise in the United States to an unaffiliated purchaser, as opposed to those general expenses incurred by the foreign producer or exporter in all sales, without regard to the identity or location of the purchaser. Subsection D, in turn, is a general provision which merely provides for the deduction of "any selling expenses not deducted under subparagraph (A), (B), or (C)." Under these circumstances, subsection D was at least ambiguous, and it was reasonable for Commerce to interpret subsection D as encompassing the same types of expenses as those enumerated in the previous subsections.

The plain text of 19 U.S.C. § 1677a(f) also supports Commerce's reading of the statute. Subsection (f), a new provision regarding profit adjustment for CEP sales, effectively provides for the deduction of profit on "United States expenses," which are defined to be "the total expenses described in subsections (d)(1) and (d)(2) of this section." 19 U.S.C. § 1677a(f)(2)(B). By describing the expenses to be deducted under 19 U.S.C. § 1677a(d)(1) as "United States expenses," subsection (f) assumes that the expenses at issue are indeed those expenses arising specifically out of the sale of the subject merchandise in the United States. Even more to the point, the SAA instructs that this profit deduction applies only to profits "allocable to selling, distribution and further manufacturing activities in the United States." SAA at 824, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4164. We agree with Commerce that this subsection thus suggests that the "coverage of section 772(d)(1) [19 U.S.C. § 1677a(d)(1)] is limited to those expenses incurred in connection with a sale in the United States." Preamble, 62 Fed. Reg. at 27,351.

### The SAA and the Legislative History

Micron next argues that in enacting the URAA, Congress did not intend to alter the provisions governing the deduction of selling expenses in the previous law. Micron asserts that the SAA, which purported to identify all changes in the statutory approach following the enactment of the URAA, SAA at 656–57, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4040–41, did not mention any change with respect to selling expenses. The SAA, of course, is more than mere legislative history. Congress has instructed that "[t]he statement of administrative action approved by the Congress under [19 U.S.C. § 3511(a)] shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

Micron also relies on House and Senate reports on the URAA for the proposition that the 1994 amendments to the statute did not change the "current law" with respect to the deduction of indirect selling expenses. The House report, H.R. Rep. No. 103–826, at 79 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3851, states that the amended statute "retain[s] current U.S. law with respect to the deduction made for direct and indirect expenses..." The pertinent Senate report states that:

> [A]mended section 772(d)(1)(D) [19 U.S.C. § 1677a(d)(1)(D)] provides, as under current law, for the deduction of indirect selling expenses. The Committee intends that this category will, as under current practice, encompass those expenses that do not result from, or cannot be tied directly to specific sales, but that may reasonably be attributed to such sales.

S. Rep. No. 103–412, at 65 (1994).

Micron further argues that the provision of the pre-URAA statute corresponding to current subsection D was interpreted by the Department of Commerce to require the deduction of all indirect selling expenses, and that the Court of International Trade reached a similar conclusion in *Silver Reed America Inc. v. United States,* 683 F.Supp. 1393 (C.I.T.1988). Micron contends that Congress should be assumed to have been aware of *Silver Reed* and Commerce's interpretation when it enacted the URAA; and that, under such circumstances, we should assume that *Silver Reed* and Commerce's corresponding interpretation were incorporated into the amended antidumping statute. Thus, Micron contends, Commerce's current interpretation contravenes the amended statute.

Micron's argument has considerable force, but we are not convinced.

First, we do not read the SAA to state that current law as to the expenses enumerated in 19 U.S.C. § 1677a(d) is not being changed. Indeed, the SAA suggests to the contrary. It lists the adjustments enumerated in a different section—19 U.S.C. § 1677a(c)—and states that "[t]hese adjustments have not changed from current law." SAA at 823, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163. But then in the next paragraph it states:

> Additionally, under new section 772(d) [19 U.S.C. § 1677a(d)], constructed export price will be calculated by reducing the price of the first sale to an unaffiliated customer in the United States by the amount of the following expenses (and profit) associated with economic activities occurring in the United States: ... The deduction of profit is a new adjustment in U.S. law, consistent with the language of the [Antidumping] Agreement, which reflects that constructed export price is now calculated to be, as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers.

*Id.* The fact that the profit deduction is "a new adjustment in U.S. law" hardly suggests that the § 1677a(d) expense deductions, unlike the § 1677a(c) adjustments, have not been changed.

Second, even if we assume that Congress did not intend to change the law with respect to the deduction of indirect selling expenses, there is no evidence that Congress understood the "law" to be anything more than the earlier statutory provisions with respect to selling expenses. The pre-URAA statute, while explicit with respect to the deduction of certain selling expenses, was ambiguous as to what other selling expenses were to be deducted. It merely provided, in pertinent part, for the deduction of "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." 19 U.S.C. § 1677a(e)(2) (1988). In short, the pre-URAA statute does not define the scope of indirect selling expenses to be deducted. Therefore, Congress at best determined to continue the existing ambiguity.

Third, no claim is made that the *Silver Reed* decision was called to Con-

gress' attention. Micron urges that if Congress re-enacts a statute which has been judicially interpreted, then Congress is presumed to have adopted the interpretation, citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). However, Micron has not demonstrated that Congress was aware of the decision in *Silver Reed* when it amended the statute. We are unwilling to apply the presumption relied upon by Micron when there is no evidence that Congress' attention was directed to the decision in *Silver Reed* when the statute was re-enacted.

For example, in *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431, 75 S.Ct. 473, 99 L.Ed. 483 (1955), the Supreme Court held that money received by a taxpayer as exemplary damages for fraud or as punitive damages in a treble-damage antitrust action was reportable "gross income," under section 22(a) of the Internal Revenue Code. The taxpayers pointed to a decision of the Board of Tax Appeals which held punitive damages to be nontaxable, and argued that because Congress had re-enacted section 22(a) without change following the Board's decision, such re-enactment "indicates congressional satisfaction with that holding." The Supreme Court disagreed, stating that "[r]e-enactment—particularly without the slightest affirmative indication that Congress ever had the [Board of Tax Appeals] decision before it—is an unreliable indicium at best." *Id.* Subsequent decisions of the Supreme Court have reaffirmed this prerequisite for the application of the presumption.[9] In short, at least without evidence of Congress' awareness of the decision in *Silver Reed*, we will not presume that Congress adopted the Court of Inter-

national Trade's reasoning in that decision when it amended the antidumping statute.

Fourth, no claim is made that the *Silver Reed* decision was a settled judicial interpretation of the statute. The decision of the Court of International Trade on this issue was hardly the last word regarding the interpretation of the pre-URAA antidumping statute. Under these circumstances we would not assume that Congress intended to adopt sub silentio the single decision of a trial court, even if it had been aware of the decision. In *United States v. Powell*, 379 U.S. 48, 55 n. 13, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), for example, the Supreme Court declined to presume that Congress had adopted the reasoning of four judicial decisions when it twice re-enacted a provision of the Internal Revenue Code. The Court stated that "[t]hese cases represent neither a settled judicial construction ... nor one which we should be justified in presuming Congress, by its silence, impliedly approved." *See also Bragdon v. Abbott*, 524 U.S. 624, 646, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (stating that the presumption applies "[w]hen administrative and judicial interpretations have settled the meaning of an existing statutory provision ..."); *Pierce v. Underwood*, 487 U.S. 552, 567, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (noting that Congressional reenactment of statute "that had in fact been given a consistent judicial interpretation ... generally includes the settled judicial interpretation").

Finally, while Commerce had interpreted the pre-URAA statute to provide for the deduction of indirect selling expenses related to sales in the United States, we do not assume that Congress silently intended to adopt such an interpretation by the agency. Again, this pre-

---

9. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 n. 8, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) (declining to presume that a "passing reference" to a judicial decision in the legislative history of amendments to the Fair Labor Standards Act demonstrated that "Congress approved the [judicial decision] in enacting the 1974 amendments by mentioning

it as the current interpretation and failing to amend that reading"); *see also Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (applying presumption where "Congress exhibited a detailed knowledge of the [Fair Labor Standards Act] provisions and their judicial interpretation").

sumption of implicit Congressional approval of an administrative interpretation requires that Congress be aware of the existence of the agency's interpretation.[10] Micron has presented no evidence that Congress, when it amended the antidumping statute, was aware of Commerce's interpretation of the pertinent provisions of the pre-URAA statute.

Micron argues that the specific language of the Senate and House Committee reports refers to "current practice" and states that section 1677a(d)(1)(D) will "encompass those expenses that do not result from, or cannot be tied directly to specific sales, but that may reasonably be attributed to such sales." S. Rep. No. 103–412, at 65 (1994). This, says Micron, makes clear that Congress was not limiting the deductible expenses to those solely related to U.S. sales.

Unfortunately for Micron, the reports are ambiguous. The reference to "current practice" standing alone is unclear, and the Senate report, for example, can be read as intended to ensure that it is not necessary to tie expenses to individual U.S. sales or not necessary to tie expenses to U.S. sales at all. Those reports fall far short of demonstrating that Congress was aware of Commerce's interpretation, or that it endorsed it.

Any assumption that Congress intended to freeze an administrative interpretation of a statute, which was unknown to Congress, would be entirely contrary to the concept of *Chevron*—which assumes and approves the ability of administrative agencies to change their interpretation.

As the Supreme Court noted, "[t]he power of an administrative agency to administer a congressionally created … program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)). Congress cannot, and need not, draft a statute which anticipates and provides for all possible circumstances in which a general policy must be applied to a specific set of facts. It properly leaves this task to the authorized agency. Commerce's ability to alter its interpretation of the antidumping statute is particularly important because Commerce is the acknowledged "master" of the antidumping laws, and its interpretations of the pertinent statutes are "worthy of considerable deference." *Zenith Elecs. Corp. v. United States,* 77 F.3d 426, 430 (Fed.Cir.1996); *see also Micron Tech., Inc. v. United States,* 117 F.3d 1386, 1394 (Fed.Cir.1997) ("In antidumping cases, we acknowledge Commerce's special expertise and accord substantial deference to its construction of pertinent statutes.").

*Congressional Purpose*

Micron next argues that the effect of Commerce's interpretation is to exclude from the scope of 19 U.S.C. § 1677a(d)(1)(D) those expenses incurred outside of the United States, a result Micron asserts is contrary to the intent of Congress.

Micron also argues that deducting all selling expenses serves the purposes of

---

**10.** *See In re Donaldson Co.,* 16 F.3d 1189, 1193 n. 3 (Fed.Cir.1994) (en banc) (stating that reenactment of statute, unaccompanied by Congressional awareness of current agency practice, did not indicate Congressional approval of practice); *see also City of Pleasant Grove v. United States,* 479 U.S. 462, 468, 107 S.Ct. 794, 93 L.Ed.2d 866 (1987) ("Congress was aware of the Attorney General's view … and implicitly approved it, when it reenacted the Voting Rights Act. …"); *San Huan New Materials High Tech, Inc. v. International Trade Comm'n,* 161 F.3d 1347, 1355 (Fed.Cir. 1998) (noting that Congress ratifies agency practice when it legislates in that area of law covered by practice, with full awareness of agency's practice, and does not change or refer to that practice); *Kemira Fibres Oy v. United States,* 61 F.3d 866, 873 (Fed.Cir.1995) (stating that language in Statement of Administrative Action endorsing Commerce's interpretation of regulation meant that "when Congress enacted the current antidumping statute, it ratified Commerce's position…"); *see generally* 2B Norman J. Singer, *Statutes and Statutory Construction,* § 49.09 (6th ed. 2000) (discussing rule of implied adoption of agency interpretation).

Congress by preventing the false characterization of expenses by the overseas producer or exporter. Micron urges that unless all indirect selling expenses are deducted, foreign competitors will deliberately shift certain expenses out of the United States to mask the extent of the dumping, thereby defeating the Congressional purpose.

In fact, Commerce has not imposed any geographic limitation on those expenses deductible under subsection D. For example, Commerce's regulation provides, in pertinent part, that Commerce "will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, *no matter where or when paid.*" 19 C.F.R. § 351.402(b) (emphasis added). As Commerce explained in the Preamble accompanying that regulation:

> [T]he phrase "no matter where or when paid" is intended to indicate that if commercial activities occur in the United States and relate to the sale to an unaffiliated purchaser, expenses associated with those activities will be deducted from CEP even if, for example, the foreign parent of the affiliated U.S. importer pays those expenses.

Preamble, 62 Fed. Reg. at 27,351.

In several instances since the passage of the URAA, Commerce has deducted indirect selling expenses physically incurred overseas because they were "associated with economic activities occurring in the United States." SAA at 823, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163. *See, e.g., Certain Stainless Steel Wire Rods from France,* 61 Fed. Reg. 47,874, 47,881–82 (Sept. 11, 1996) (final admin. review); *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany,* 61 Fed. Reg. 38,166, 38,173–74 (July 23, 1996) (final determination).

Indeed, it is Micron's interpretation that makes no sense in terms of the statutory purpose. As discussed above, the overarching purpose of the antidumping statute is to permit a "fair, 'apples-to-apples'

comparison between foreign market value and United States price . . . ." *Torrington Co.,* 68 F.3d at 1347; *see also* 19 U.S.C. § 1677b(a) (providing that "a fair comparison shall be made between the export price or constructed export price and normal value"). Commerce makes this "fair comparison" by adjusting CEP so that is at the same level of trade as EP and then making a comparison to normal value. The SAA provides, in pertinent part, that:

> The deduction of profit is a new adjustment in U.S. law, consistent with the language of the [Antidumping] Agreement, *which reflects that constructed export price is now calculated to be, as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers.*

SAA at 823, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163 (emphasis and brackets added); *see also* Preamble, 62 Fed. Reg. at 27,371 ("CEP is not a price exclusive of all selling expenses, because it contains the same type of selling expenses as a directly observed export price.").

To calculate CEP at a price corresponding to EP, Commerce logically must deduct only those expenses incurred solely in CEP transactions, i.e., only those expenses associated with the sale of subject merchandise to an unaffiliated purchaser in the United States by a party affiliated with the foreign producer or exporter. As discussed above, the expenses at issue here are incurred by LG Semicon regardless of whether it uses an affiliated distributor in the United States to market its products, or sells directly to unaffiliated purchasers in the United States. It is undisputed that these expenses are not deducted when calculating EP. The deduction of these expenses from CEP, without corresponding deductions from EP, would cause adjusted CEP not to correspond to EP, a result contrary to the language of the SAA.

In other words, the expenses to be deducted from the CEP starting price to make it comparable to EP are those expenses associated with the more advanced

level of trade represented by the CEP starting price, i.e., the expenses associated with the sale to the first non-affiliated purchaser in the United States. The expenses that Micron seeks to deduct are not such expenses. Rather, these expenses—sales office rents in Korea, salesmen's salaries in Korea, and certain inventory carrying costs—are incurred by LG Semicon regardless of whether it uses an affiliated distributor in the United States to market its products. In short, these indirect selling expenses are no more of an expense related to the use of affiliated United States entities than the raw material costs incurred during the production of the merchandise.

In sum, we find, contrary to Micron's suggestion, that 19 U.S.C. § 1677a(d)(1)(D) is ambiguous as to the scope of the indirect selling expenses to be deducted under the CEP methodology. We further find that the Department of Commerce's interpretation of that provision in the administrative decision under review is reasonable, and therefore entitled to deference under *Chevron.* Accordingly, we affirm the Court of International Trade as to Issue 1.

### III

Level of Trade Adjustment

We now turn to the second issue, concerning the level of trade adjustment. Here Micron contends, and the Court of International Trade agreed, that the deductions to the starting price in CEP sales set forth in 19 U.S.C. § 1677a(d) and discussed above should not be made before the level of trade comparison is made. Resolution of this issue requires an understanding of how the level of trade adjustment works.

As discussed above, the level of trade adjustment is designed to ensure that the normal value and U.S. price are being compared for countervailing duty purposes at the same level of trade, that is, at the

same marketing stage in the chain of distribution that begins with the manufacturer. "Each more remote level [of trade] must be characterized by an additional layer of selling activities, amounting in the aggregate to a substantially different selling function." Preamble, 62 Fed. Reg. at 27,371.[11] Accordingly, "[t]he adjustments under subsection (d) normally change" the level of trade. *Id.* at 27,370.

Micron contends that deducting the selling expenses set forth in 19 U.S.C. § 1677a(d) before making the level of trade comparison in CEP sales is unfair because the deduction changes the level of trade, and the Court of International Trade agreed, relying on its holding and reasoning in *Borden Inc. v. United States,* 4 F.Supp.2d 1221 (C.I.T.1998). We are at a loss to understand why this is so. The theory appears to be that selling expenses are incurred both in the home market and the U.S. market and thus, accordingly, such expenses should not be deducted from CEP before making the level of trade comparison. But the theory of the statute does not require that the level of trade comparison be made at the more advanced level of trade reflected in unadjusted CEP. Rather, the level of trade comparison is to be made at the level of trade that most nearly corresponds to EP—i.e., a sale to an unaffiliated importer and at the level of trade which will be used in the duty calculation. This is the level of trade reflected in adjusted CEP. Admittedly, Commerce's methodology results in comparison of adjusted CEP with unadjusted normal value. However, as discussed above, the very purpose of the comparison is to determine whether an adjustment should be made to normal value. That adjustment itself results in comparability.

■ Whatever the theoretical merits or demerits of the two different approaches, the plain text of the statute and the text of

---

**11.** Note, however, that "[s]ubstantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.

Some overlap in selling activities will not preclude a determination that two sales are at different stages of marketing." 19 C.F.R. § 351.412(c)(2).

the accompanying SAA answer the question for us. The statute states that Commerce shall establish normal value, "to the extent practicable, at the same level of trade as the export price or constructed export price [CEP]..." 19 U.S.C. § 1677b(a)(1)(B)(i), and further specifically defines CEP as the price at which merchandise is first sold (or agreed to be sold) in the United States "*as adjusted under subsections (c) and (d) ....*" 19 U.S.C. § 1677a(b) (emphasis added). Read together, these two provisions show that Commerce is required to deduct the subsection (d) expenses from the starting price in the United States before making the level of trade comparison since that deduction will likely affect the level of trade.

The clear language of the SAA further demonstrates that Congress intended that Commerce use the adjusted price for CEP sales after the subsection (d) deductions are made, rather than the starting price, when making the level of trade comparison. The SAA states that the amended statute requires Commerce "to the extent practicable, [to] establish normal value based on home market (or third country) sales at the same level of trade *as the constructed export price or the starting*

*price for the export price.*" SAA at 829, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4167 (emphasis added). Congress' intent is clear: when making a level of trade comparison for EP sales, Commerce is to use the "starting price," i.e., the unadjusted price. In contrast, when making a level of trade comparison for CEP sales, Commerce is to use the "constructed" price, i.e., the price which reflects the deductions made pursuant to § 1677a(d).

We note that it can be argued under these provisions that an adjustment to CEP under subsection (c) of 19 U.S.C. § 1677a is also required before making the level of trade comparison. That issue is not presented here. We need not (and do not) decide the question as to the necessity of the subsection (c) adjustments before making the level of trade comparison.[12]

Micron next argues that the practical effect of Commerce's methodology in requiring the § 1677a(d) deductions is to improperly require, in every case, either a level of trade adjustment or a CEP offset. Commerce itself has recognized that "[t]he statute clearly anticipates that an adjustment for differences in levels of trade will not be necessary every time the Department [of Commerce] uses CEP." Pream-

**12.** Commerce does not make the adjustments provided in subsection (c) of 19 U.S.C. § 1677a before making the level of trade comparison. 19 C.F.R. § 351.412(c)(1)(ii). This approach is followed because the (c) adjustments are not made when a comparison of EP and normal value is made. *See* SAA at 829, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4167. It is not at all clear that the § 1677a(c) adjustments affect the level of trade in any event. *See* Preamble, 62 Fed. Reg. at 27,370–71 ("The adjustments under subsection (d) normally change the LOT [level of trade], so that the Department must determine the LOT of CEP sales after any deductions under subsection (d). The adjustments under subsection (c), however, are made to both EP and CEP. Therefore, determining the LOT on the basis of EP or CEP before any deductions under subsection (c) yields the LOT of the EP or CEP.").

We note that in *Borden*, the Court of International Trade declined to require Commerce to make the adjustments set forth in 19 U.S.C.

§ 1677a(c) before making the level of trade comparison, concluding that although "[f]ully adjusting CEP sales prices has the apparent advantage of at least matching the definition of CEP set forth for price comparison purposes," doing so would create an "automatic CEP offset based on the comparison of a fully adjusted CEP with an unadjusted normal value price." *Borden*, 4 F.Supp.2d at 1241. This issue was not raised on the appeal from the *Borden* decision. Both of the appellants in *Borden* indeed urged that the adjustments made to CEP pursuant to 19 U.S.C. § 1677a(c) do not change the level of trade. Brief for Defendant–Appellant United States, at 24 ("[T]he movement expenses, taxes and duties deducted pursuant to paragraph (c) are not expenses for selling activities. These expenses, therefore, will not affect the level of trade analysis ..."); Brief for Defendant–Appellants Delverde, SrL and Deverde USA, Inc., at 24 ("Expenses deducted pursuant to subsection 1677a(c) [19 U.S.C. § 1677a(c)] do not change the LOT.").

ble, 62 Fed. Reg. at 27,351. But such adjustments will not be routine under Commerce's interpretation of the scope of the D deductions. Indeed, Micron conceded at oral argument that if the deductions set forth in 19 U.S.C. § 1677a(d)(1)(D) do not include all indirect selling expenses, as we have held, the question whether the deductions set forth under § 1677a(d) are made before or after the level of trade comparison has relatively less impact. This is presumably because the inclusion or exclusion of the more limited deductions set forth in subsection D has less impact on the level of trade, i.e., less impact on the selling functions reflected in the price, than the broader deduction of all selling expenses.

Furthermore, the CEP offset will not be automatic. Indeed, as Commerce explained in its Preamble:

> Some commenters suggested that the CEP offset is "automatic." This is not the case. The Department will calculate CEP by deducting only selling expenses and profit associated with selling activities in the United States. Thus, the resulting CEP will retain an element of selling expenses and an element of profit, as do directly observed export prices. We do not agree that there never will be comparable sales in the foreign market.

62 Fed. Reg. at 27,372. Moreover, in several antidumping investigations concerning CEP sales, application of Commerce's methodology has not resulted in the grant of either a level of trade adjustment or a CEP offset. *See, e.g., Fresh Kiwifruit from New Zealand,* 64 Fed. Reg. 36,844, 36,845–46 (July 8, 1999) (prelim. admin. review); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom,* 62 Fed. Reg. 54,043, 54,-060 (Oct. 17, 1997) (comment 7) (final admin. review); *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Steel Wire Rod From Canada,* 62 Fed. Reg. 51,572, 51,575–76 (Oct. 1, 1997).

In sum, we find that the statute unambiguously requires Commerce to deduct the selling expenses set forth in 19 U.S.C. § 1677a(d) before making a level of trade comparison, and we reject the holding and rationale of the Court of International Trade in *Borden, Inc. v. United States,* 4 F.Supp.2d 1221 (C.I.T.1998). We therefore reverse the Court of International Trade's disposition of Issue 2.

## CONCLUSION

For the foregoing reasons, the decision of the Court of International Trade is affirmed in part and reversed in part.

**AFFIRMED IN PART AND REVERSED IN PART.**

## COSTS

No costs.