**Slip. Op. 99 – 29**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  RICHARD W. GOLDBERG, JUDGE**

MICRON TECHNOLOGY, INC.,

               Plaintiff,

        v.

THE UNITED STATES,

               Defendant,

        and

LG SEMICON CO., LTD., and
LG SEMICON AMERICA, INC.,

               Defendant-Intervenors.

Court No. 97-02-00205

[Final Results in the second administrative review of an antidumping duty order of the U.S. Department of Commerce is sustained in part, and remanded in part.]

Dated: March 25, 1999

Hale & Dorr, LLP (Gilbert B. Kaplan, Michael D. Esch, Paul W. Jameson, and Cris R. Revaz), for plaintiff Micron Technology, Inc.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michele D. Lynch); Office of the Chief Counsel for Import Administration, United States

Department of Commerce (<u>Jeffrey C. Lowe</u>), of counsel, for defendant.

   Kaye, Scholer, Fierman, Hays & Handler, LLP (<u>Michael P. House</u> and <u>Raymond Paretzky</u>), for defendant-intervenors LG Semicon Co., and LG Semicon America, Inc.


### OPINION

**GOLDBERG, Judge:** In this action, the Court reviews two challenges to the Department of Commerce's ("Commerce") <u>Notice of Final Results of Antidumping Administrative Review: Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea</u>, 62 Fed. Reg. 965 (Jan. 7, 1997) ("<u>Final Results</u>").  More specifically, plaintiff, Micron Technology, Inc. ("Micron"), petitioner in the underlying administrative review, contests (1) Commerce's decision not to deduct from constructed export price ("CEP") an amount for indirect selling expenses incurred by respondent, LG Semicon Co., Ltd. and LG Semicon America, Inc. (collectively "LG Semicon"), in its home market; and (2) Commerce's methodology for the level of trade ("LOT") analysis in CEP cases.

   The Court exercises jurisdiction to review this motion for judgment on the agency record pursuant to 28 U.S.C. § 1581(c) (1994).  The Court sustains the <u>Final Results</u> in part, and

remands in part.

## I.
## BACKGROUND

Micron, a U.S. manufacturer of dynamic random access memory semiconductors ("DRAMS"), filed a petition with Commerce on April 22, 1992, alleging that Korean producers of DRAMS were selling subject merchandise in the United States at less than fair value. Following an antidumping investigation, Commerce published an antidumping order on DRAMS from Korea in May, 1993. See 58 Fed. Reg. 27520 (May 10, 1993).

During the first anniversary month of the order, Micron and three Korean respondents, including LG Semicon, requested an administrative review of the DRAMS order. As a result of the first administrative review, Commerce assigned a dumping margin of 0.00% to LG Semicon.[1] See 61 Fed. Reg. 20,216, 20,222 (May 6, 1996). In the second anniversary month of the order, the parties again requested an administrative review of the order. Commerce

---

[1] Micron appealed several aspects of Commerce's decision with respect to LG Semicon for the first review period. In January of this year, the Court sustained part of Commerce's decision and remanded one issue to Commerce for further review. See Micron Technology, Inc. v. United States, Slip Op. 99-12 (CIT Jan. 28, 1999).

initiated its second administrative review of the Korean DRAMS

order on June 15, 1995, covering the period from May 1, 1994

through April 30, 1995.  See 60 Fed. Reg. 31,448 (June 14, 1995).

At the close of the second review, Commerce assigned a de minimis

dumping margin to LG Semicon.  See Final Results, 62 Fed. Reg. at

968.  Micron again appealed these results, and it is this second

administrative review that is the subject of the case at bar.[2]

     Two aspects of Commerce's Final Results are of particular

relevance to this appeal.  First, Commerce determined that

certain indirect selling expenses incurred by LG Semicon in Korea

"do not result from or bear relationship to selling activities in

the United States."  62 Fed. Reg. at 968 (cmt. 4).  As a result,

Commerce decided that LG Semicon's indirect selling expenses

incurred outside the United States should not be deducted from LG

Semicon's CEP.[3]  The practical effect of

---

[2] Because Commerce initiated the review after January 1,
1995, the applicable law in the instant case is the antidumping
code as amended by the Uruguay Round Agreements Act ("URAA"),
Pub. L. No. 103-465, tit. II, 108 Stat. 4809 (1994).  See
Torrington Co. v. United States, __ Fed. Cir. (T) __, __, 68 F.3d
1347, 1352 (1995).

[3] Constructed export price or "CEP," along with exporter's
price or "EP," is the statutory mechanism used to calculate what
has traditionally been known as U.S. price.  In turn, U.S. price
anchors one end of the U.S. price to normal value comparison,

from which a dumping margin is derived.  Typically, an EP sale involves a direct sale from the foreign exporter to an unrelated U.S. purchaser, whereas a CEP sale is made to a related U.S. purchaser and then an unaffiliated party.  All sales at issue in this proceeding are CEP sales.  More specifically, Congress defined a CEP sale in Section 772(b) of the URAA as follows:

> The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

19 U.S.C. § 1677a(b).  As relevant here, subsection (d) of this section provides that CEP shall be reduced by

> the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added) -
>
> > (A) commissions for selling the subject merchandise in the United States;
> >
> > (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
> >
> > (C) any selling expenses that the seller pays on behalf of the purchaser; and
> >
> > (D) any selling expenses not deducted under subparagraph (A), (B), or (C).

19 U.S.C. § 1677a(d)(1).  As discussed above, Commerce determined the expenses at issue here do not bear a direct relationship to U.S. sales and, hence, should not be deducted from CEP under

Commerce's decision was a higher CEP and, thereby, a lower

dumping margin.

Second, in accordance with the law as amended by the URAA,

Commerce requested information from LG Semicon in order to

conduct a level of trade analysis.[4]  To assess level of trade in

the second review period, Commerce first calculated a

"constructed" CEP by deducting indirect selling expenses.

_____

section 1677a(d)(1).

[4] In Section 773(a)(1)(B) of the URAA, Congress required
Commerce to establish normal value "to the extent practicable, at
the same level of trade as the export price or constructed export
price."  19 U.S.C. § 1677b(a)(1)(B).  Importantly, Congress also
provided that when Commerce is unable to match sales at the same
level of trade, an adjustment to normal value should be made to
account for the differences in price that result from the
differences in level of trade.  See 19 U.S.C. § 1677b(a)(7)(A).

But, most importantly for purposes here, Congress provided
that when the data indicate that normal value sales are at a more
advanced level of distribution, yet are insufficient to warrant
an adjustment under section 1677b(a)(7)(A), normal value still
should be reduced by what is known as the "CEP offset."
Specifically, Congress stated that when a level of trade
adjustment is not warranted, yet normal value sales are at a more
advanced level of distribution,

    normal value shall be reduced by the amount of indirect
    selling expenses incurred in the country in which normal
    value is determined on sales of the foreign like product but
    not more than the amount of such expenses for which a
    deduction is made [to CEP].

19 U.S.C. § 1677b(a)(7)(B).

Commerce then compared the "constructed" CEP sales to LG Semicon's normal value sales, which in this instance were home market sales.  In doing so, Commerce determined that the sales in the two markets were at different levels of trade.  Yet, because there was no basis upon which to determine if price differences existed between the two levels of trade, Commerce granted LG Semicon a "CEP offset," thereby reducing normal value by an amount for home market indirect selling expenses.  See supra note 4.

Micron challenges both actions by Commerce.  First, Micron contends that Commerce erred as a matter of law when it declined to deduct indirect selling expenses incurred outside the United States from CEP.  Second, Micron maintains that Commerce's decision to adjust LG Semicon's CEP prior to making the level of trade comparison was methodologically unsound and contrary to law.  Commerce and LG Semicon oppose both challenges to the Final Results.

## II.
### STANDARD OF REVIEW

Commerce's determination will be sustained if it is supported by substantial evidence on the record and is otherwise

in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B) (1994).


## III.

## DISCUSSION

**A.    Commerce's Decision Not to Deduct Indirect Selling Expenses Incurred Outside the United States Was In Accordance With Law.**

Micron first contends that under the pre-URAA statute, indirect selling expenses incurred outside the United States were always deducted from U.S. price.[5]  See Pl.'s Br. In Supp. Of Mot. for J. On Agency Rec., at 8-10.  Indeed, Micron emphasizes that the court explicitly sustained the pre-URAA practice in Silver Reed America, Inc. v. United States, 12 CIT 39, 43-44, 679 F. Supp. 12, 16 (1998) (holding that Commerce could deduct selling expenses related to U.S. sales from ESP, regardless of where geographically the expenses were incurred).  Micron then argues that because this section of the antidumping code was not amended by the URAA, Commerce's decision to deviate from its former

---

[5]    Under the pre-URAA statute, Commerce calculated a respondent's U.S. price using either the "purchase price" ("PP") or "exporter's sales price" ("ESP").  These designations were amended under the URAA and are now referenced as "exporter's price" ("EP") and "constructed export price" ("CEP"), respectively.  See Statement of Administrative Action to the URAA ("SAA"), H.R. Doc. No. 103-316 (1994), at 822.

practice and now exclude indirect selling expenses incurred outside the United States was not in accordance with law. Specifically, Micron notes that the URAA amendments had no substantive effect on the definitions for the terms used to calculate U.S. price.  Compare 19 U.S.C. § 1677a(b) & (c) (1988) (defining "purchase price" and "exporter's sales price"), with 19 U.S.C. § 1677b(a) & (b) (1994 as amended) (defining "EP" and "CEP").  Micron also points out the SAA makes clear that "[n]otwithstanding the change in terminology, no change is intended in the circumstances under which export price (formerly 'purchase price') versus constructed export price (formerly 'exporter's sales price') are used."  SAA at 822-23.  Micron's syllogism thus runs, because Commerce always deducted indirect selling expenses from ESP, whether incurred inside the United States or not, and because the substantive provision governing the deduction of indirect selling expenses was not changed by the URAA amendments, Commerce's decision to alter its practice here was not in accordance with law.

     Micron's argument cannot withstand scrutiny.  As all parties concede, neither the pre-URAA statute, nor the statute as amended by the URAA, defines those selling expenses that should

be categorized as "indirect" selling expenses.  Compare 19 U.S.C. § 1677a(d)(1) (1988), with 19 U.S.C. § 1677a(d)(1) (1994). Because the statute is silent, the Court must look to see if Commerce's decision not to deduct the expenses at issue was reasonable.

The Court finds Commerce's decision was reasonable.  It is true that Commerce previously construed the statutory silence to mean that all indirect expenses were "related to U.S. sales," regardless of where geographically they were incurred.  And now, Commerce interprets "expenses associated with economic activities occurring in the United States" to mean only those expenses that bear a direct relationship to sales made to unaffiliated U.S. purchasers.  Yet, Commerce's decision to revise its practice is reasonable in view of the SAA that accompanied the URAA.  The SAA provides that under 19 U.S.C. § 1677a, deductions from CEP are limited to those expenses "associated with economic activities occurring in the United States."  SAA at 823 (emphasis added). This language from the SAA plainly contemplates something more than the practice sustained in Silver Reed.  That is, it is not enough simply to assert that the expenses are indirect selling expenses and, therefore, must be deducted from CEP.  Rather, the

SAA explains that the expenses must be linked to or "associated with" actual U.S. sales before they can be deducted from CEP.[6] In addition, the Court finds that, contrary to Micron's argument, the relevant language from the SAA should not be dismissed as mere legislative history.  As Commerce notes, Congress expressly approved the SAA as the authoritative expression governing application of the URAA in judicial proceedings.  See 19 U.S.C. § 3512(d) (1994) (stating that the SAA is approved by Congress and that it is the authoritative expression of the United States concerning application of the antidumping statute as amended under the URAA).  Thus, the Court finds that the SAA provided Commerce a reasonable basis upon which to alter the practice sustained by the court in Silver Reed.

Finally, and perhaps most importantly, in Timken Co. v.

---

[6] The Court notes that under Commerce's current practice, it is possible that indirect selling expenses incurred outside the United States may be deducted from CEP.  Indeed, Commerce has deducted indirect selling expenses that, geographically, were incurred outside the United States, yet still bore a relationship to unaffiliated party sales in the United States; the court has sustained this practice.  See Mitsubishi Heavy Indus., Ltd. v. United States, 22 CIT __, __, 15 F. Supp.2d 807, 818 (1998) (sustaining Commerce's decision to deduct indirect selling expenses incurred in Japan from CEP because the expenses were incurred to support U.S. sales and, hence, were "associated with" economic activities occurring in the United States).

United States, 22 CIT __, 16 F. Supp.2d 1102 (1998), the court
upheld Commerce's current practice on this precise issue.  In
Timken, the court also noted that neither the pre-URAA statute
nor the statute as amended address whether indirect selling
expenses incurred outside the United States should be deducted
from CEP.  The Timken court similarly found Commerce's altered
practice reasonable in light of the specific language in the SAA
that only expenses "associated with economic activities occurring
in the United States" should be deducted from CEP.  Id. at __, 16
F. Supp.2d at 1106.  The Court here endorses the Timken analysis.

     Accordingly, the Court finds Commerce's decision not to
deduct the indirect selling expenses incurred by LG Semicon
outside the United States from CEP was reasonable and in
accordance with law.

**B.   Commerce's Methodology Used to Conduct The Level of Trade
       Analysis for CEP Sales Was Not In Accordance With Law.**

     Micron next argues that the methodology Commerce used to
make the threshold level of trade analysis[7] was internally
inconsistent.  More precisely, Micron claims that Commerce

---

     [7] See supra note 4.

applies one standard in EP situations and another in CEP

situations without any statutory basis: (1) in EP situations,

Commerce compares <u>unadjusted</u> EP sales (i.e., U.S. sales) to

<u>unadjusted</u> normal value sales (e.g., home market sales) to assess

level of trade; and (2) in CEP situations, Commerce compares the

level of trade of "<u>adjusted</u>" or "<u>constructed</u>" CEP sales (i.e.,

U.S. sales) to <u>unadjusted</u> normal value sales to assess level of

trade.  In the CEP scenario, Commerce "adjusts" or "constructs"

CEP sales by deducting the indirect selling expenses from CEP

prior to making the level of trade comparison.  Micron claims

that there is no basis in the statute for the distinction between

EP and CEP level of trade methodology and, hence, there is no

legal basis to "adjust" or "construct" CEP prior to making the

level of trade comparison.  <u>See</u> 19 U.S.C. § 1677b(a)(7)(A).

According to Micron, the tangible result of this unwarranted

methodological distinction is a deflated dumping margin.  That

is, Micron argues that because indirect selling expenses are

"stripped" from CEP prior to the level of trade comparison, the

home market level of trade will always be deemed more advanced in

CEP situations, which in turn will result in a CEP offset and a

downward adjustment to normal value.  And, in sum, the potential

dumping margin will decrease in CEP situations as a result of Commerce's current methodology.

Once again, the court addressed this precise issue in Borden, Inc. v. United States, 22 CIT __, 4 F. Supp.2d 1221 (1998), appeal docketed, No. 99-__ (Fed. Cir. Feb. 12, 1999). The Borden court first observed that there is no statutory ambiguity in 19 U.S.C. § 1677b(a)(7), the level of trade provision. "The statute clearly provides for a conditional level of trade adjustment, instructing Commerce to make the adjustment to normal value if various conditions obtain[]. By contrast, the methodology employed by Commerce amounts to an unconditional adjustment in every CEP case." Id. at __, 4 F. Supp.2d at 1240 (citation omitted). The court then specifically pointed out that the statute never mentions that adjustments for selling expenses should be made to CEP prior to the LOT analysis. Id. at __, 4 F. Supp.2d at 1241. Importantly, the Borden court determined that, notwithstanding the statutory silence, Commerce could not inject its own view of the LOT provision because "Commerce's limited adjustment to price before the LOT analysis contravenes the purpose of the statute. The statute leaves no room for Commerce's ostensible discretion to pre-adjust for selling

expenses in the United States through the automatic deduction of [indirect] selling expenses prior to the LOT analysis in all CEP cases."  Id.  The Borden court thus rejected the same methodology as that used in the instant case.

On this issue, the Court finds the reasoning articulated in Borden well developed and correct.  The Court adopts that reasoning here and, in line with the Borden precedent, continues to hold that the methodology Commerce employed to conduct the level of trade analysis in this CEP case is contrary to law.  The Court therefore remands this issue to Commerce for further review in light of its opinion.

## IV.

## CONCLUSION

For the foregoing reasons, the Court remands the <u>Final</u> <u>Results</u> to Commerce for further consideration as to the methodology to be used when it conducts the level of trade analysis in CEP situations.  In all other respects, the Court sustains the <u>Final Results</u>.  A separate Order will be entered accordingly.

_____
Richard W. Goldberg
JUDGE

Dated:    March 25, 1999
          New York, New York.