**Slip Op. 02-54**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                                      :
THE TIMKEN COMPANY,                                   :
                                                      :
              Plaintiff,                              :
                                                      :
              v.                                      :    Court No.
                                                      :    98-12-03237
UNITED STATES,                                        :
                                                      :
              Defendant,                              :
                                                      :
              and                                     :
                                                      :
KOYO SEIKO CO., LTD. and KOYO                         :
CORPORATION OF U.S.A.; NTN BEARING                    :
CORPORATION OF AMERICA, AMERICAN NTN                  :
BEARING MANUFACTURING CORPORATION,                    :
NTN BOWER, INC. and NTN CORPORATION,                  :
                                                      :
              Defendant-Intervenors.                  :
_____:


        Plaintiff, The Timken Company ("Timken"), moves pursuant to
USCIT R. 56.2 for judgment upon the agency record challenging the
Department of Commerce, International Trade Administration's
("Commerce") final determination, entitled <u>Final Results of
Antidumping Duty Administrative Reviews of Tapered Roller Bearings
and Parts Thereof, Finished and Unfinished, From Japan, and Tapered
Roller Bearings, Four Inches or Less in Outside Diameter, and
Components Thereof, From Japan</u> ("<u>Final Results</u>"), 63 Fed. Reg.
63,860 (Nov. 17, 1998).

        Specifically, Timken contends that Commerce unlawfully: (1)
refused to adjust constructed export price ("CEP") for indirect
selling expenses reported by Koyo Seiko Co., Ltd. and Koyo
Corporation of U.S.A. (collectively "Koyo"), and NTN Bearing
Corporation of America, American NTN Bearing Manufacturing
Corporation, NTN Bower, Inc. and NTN Corporation (collectively
"NTN"); (2) permitted NTN to exclude certain expenses attributable
to non-scope merchandise from its reported United States indirect

selling expenses; and (3) granted NTN a level of trade ("LOT") adjustment for export price ("EP") sales.

**Held:** Timken's 56.2 motion is denied.

[Timken's 56.2 motion is denied; case is dismissed.]

Dated:    June 5, 2002

Stewart and Stewart (Terence P. Stewart, William A. Fennell and Patrick J. McDonough) for Timken.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michele D. Lynch and Richard P. Schroeder); of counsel: John F. Koeppen, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States.

Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano, David G. Forgue and Kristen S. Smith) for NTN.

Powell, Goldstein, Frazer & Murphy LLP (Peter O. Suchman, Neil R. Ellis and Elizabeth C. Hafner) for Koyo.

**OPINION**

**TSOUCALAS, Senior Judge:** Plaintiff, The Timken Company ("Timken"), moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan ("Final Results"), 63

Fed. Reg. 63,860 (Nov. 17, 1998).

Specifically, Timken contends that Commerce unlawfully: (1) refused to adjust constructed export price ("CEP") for indirect selling expenses reported by Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), and NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Bower, Inc. and NTN Corporation (collectively "NTN"); (2) permitted NTN to exclude certain expenses attributable to non-scope merchandise from its reported United States indirect selling expenses; and (3) granted NTN a level of trade("LOT") adjustment for export price ("EP") sales.

## BACKGROUND

This case concerns: (1) the antidumping finding regarding tapered roller bearings ("TRBs"), four inches or less in outside diameter, and components thereof, from Japan, and (2) the 1987 antidumping duty order on TRBs and parts thereof, finished and unfinished, from Japan for the period of review ("POR") covering October 1, 1996, through September 30, 1997.[1] See Final Results,

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA

(continued...)

63 Fed. Reg. at 63,860. On July 10, 1998, Commerce published the preliminary results of the subject reviews. See Preliminary Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan ("Preliminary Results"), 63 Fed. Reg. 37,344. Commerce published the Final Results on November 17, 1998. See 63 Fed. Reg. at 63,860.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

---

[1](...continued)
amendments)).

## I.    Substantial Evidence Test

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).  Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"  American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).


## II.   Chevron Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837

(1984). Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter." Id. (citations omitted). Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations omitted); but see Floral Trade Council v. United States, 23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. See Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the

reasonableness of Commerce's interpretation. See <u>Fujitsu Gen. Ltd. v. United States</u>, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); <u>see also</u> <u>IPSCO, Inc. v. United States</u>, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." <u>Negev Phosphates, Ltd. v. United States</u>, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. See <u>Mitsubishi Heavy Indus. v. United States</u>, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

### DISCUSSION

I.   **Commerce's Decision to Limit United States Indirect Selling Expenses to Those Expenses Specifically Associated With Commercial Activity in the United States**

    **A.   Background**

The pre-URAA statute provided the reduction of exporter's sales price ("ESP") by the amount of "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise."  19 U.S.C. § 1677a(e)(2)(1988).  Although the statute was silent as to whether indirect selling expenses incurred outside the United States should be categorized as United States indirect selling expenses, Commerce chose to adjust United States price for such expenses.  See 19 C.F.R. § 353.41(e)(2)(1994); ITA ANTIDUMPING MANUAL, § 7, at 11 (rev. ed. 1993).

As revised by the URAA, the statute states that CEP, the post-URAA equivalent to ESP, is to be reduced by the amount of any "expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States[:]" including "any selling expenses not deducted under subparagraph (A) [commissions], (B) [direct selling expenses], or (C) [selling expenses assumed by the seller on behalf of the purchaser]."  19 U.S.C. § 1677a(d)(1) and (d)(1)(D) (1994).  In the Final Results, Commerce determined that

[a]s [Commerce] stated in [Final Results of Antidumping Duty Administrative Reviews and Termination in Part of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 62 Fed. Reg. 11,825, 11,834] (Mar. 13, 1997), [Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 63 Fed Reg. 2558, 2575 (Jan. 15, 1998), and Final Results of Antidumping Duty Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom, 62 Fed. Reg. 2081, 2124 (Jan. 15, 1997)], [Commerce] will deduct from CEP only those expenses associated with economic activities in the United States which occurred with respect to sales to the unaffiliated U.S. customer. [Commerce] found no information on the record for this review period to indicate that the export selling expenses for the respondents that were incurred in their respective home markets were associated with activities occurring in the United States.

63 Fed. Reg. at 63,868.

Therefore, since Koyo's and NTN's "selling expenses were not associated with economic activity in the United States[,] . . . [Commerce did not] adjust[] Koyo's or NTN's U.S. prices [for these indirect selling expenses]." Id.

### B. Contentions of the Parties

Timken asserts that the URAA "made no substantive change in the statutory requirement that constructed export prices . . . be adjusted for indirect selling expenses." Timken's Mem. Supp. Rule

56.2 Mot. J. Agency R. ("Timken's Mem.") at 10; see also Timken's Reply Br. ("Timken's Reply") at 2. In particular, Timken claims that the statutory language of the new 19 U.S.C. § 1677a(d)(1) and the Statement of Administrative Action ("SAA")[2], H.R. Doc. 103-316, at 823, indicate that Congress intended for Commerce to continue the practice of including in United States indirect selling expenses the home market selling expenses attributable to export sales.[3] See Timken's Mem. at 10-12; see also Timken's Mem. at 11

---

[2] The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." H.R. Doc. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040. "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application").

[3] Timken states that

[t]he URAA did not intend to change Commerce's approach to export selling expenses. Indeed, the SAA states that Section 772(d)(1)(C) [that is, § 1677a(d)(1)(C)] provides for the deduction of selling expenses which are assumed by the seller on behalf of the buyer. In practice, Commerce has treated these expenses in the same manner as the direct selling expenses in section 772(d)(1)(B) [that is, § 1677a(d)(1)(B)]. Their separate treatment in the statute is intended merely to provide a more precise definition, **and not to change the calculation of export price or constructed export price**. . . .

. . . .

(continued...)

(citing Sen. Rep. No. 412, 103d Cong., 2d Sess. 65 (1994)), Timken's Reply at 3-4. Timken further argues that the "old law, i.e., pre-URAA, referred only to expenses 'incurred by or for the account of the exporter in the United States,' but the URAA broadened this language to include adjustment for expenses 'incurred by or for the account of the producer or exporter, or the affiliated seller in the United States.'" Timken's Reply at 4 (emphasis omitted); see also Timken's Mem. at 12. Therefore, Timken maintains that Congress, by referring to expenses incurred by "producers or exporters," codified Commerce's prior practice under pre-URAA. See Timken's Reply at 4. Accordingly, Timken requests that the Court reexamine its decision in Timken Co. v. United States ("Timken 1998"), 22 CIT 621, 16 F. Supp. 2d 1102 (1998), and remand this issue to Commerce so that it may adjust CEP for indirect selling expenses incurred in the home market on account of United States sales (that is, export selling expenses reported by Koyo and NTN). See id. at 2, 4.

---

[3](...continued)
[D]irect expenses and assumptions of expenses incurred in the foreign country on sales to the affiliated importer will form a part of the circumstances of sale adjustment. Moreover, **Commerce's practice with respect to assumptions by the seller of the buyer's selling expenses and commissions will remain the same**.

Timken's Reply at 2-3 (emphasis in original) (quoting H.R. Doc. 103-316, at 824, 828).

Relying on this Court's decision in <u>Timken 1998</u>, 22 CIT 621, 16 F. Supp. 2d 1102, Commerce responds that it properly did not adjust CEP for indirect selling expenses reported by Koyo and NTN because the new statutory language (that is, 19 U.S.C. § 1677a(d)(1)), does not define the types of expenses to be included as United States indirect selling expenses. <u>See</u> Def.'s Mem. Opp'n Pl.'s Mot. J. Agency R. ("Def.'s Mem.") at 2, 8-10.  Moreover, Commerce states that "'it is clear from the SAA that under the new statute [Commerce] should deduct from CEP only those expenses associated with economic activities in the United States.'" Def.'s Mem. at 8 (quoting <u>Final Results</u>, 63 Fed. Reg. at 63,868); <u>see also</u> Def.'s Mem. at 7 (citing 19 C.F.R. § 351.402(b)(1998)).

Koyo and NTN generally agree with Commerce and argue that: (1) the new statutory language of § 1677a(d)(1) and the rules of statutory construction make it clear that no adjustment should be made for indirect selling expenses incurred in Japan; and (2) Commerce's practice of limiting indirect selling expenses to those specifically associated with commercial activity in the United States is in accordance with the SAA and <u>Timken 1998</u>, 22 CIT 621, 16 F. Supp. 2d 1102.[4]  <u>See</u>  Koyo's Resp. Timken's Mot. J. Agency R.

---

[4]   The Court notes that, in this case, Koyo is concerned with the antidumping finding regarding TRBs, four inches or less in outside diameter, and components thereof, from Japan.  <u>See</u> Koyo's Resp. Timken's Mot. J. Agency R. at 2 n.1.

("Koyo's Resp.") at 3-6; NTN's Resp. Mem. Timken's July 1, 1999,

Mem. Supp. Rule 56.2 Mot. J. Agency R. ("NTN's Resp.") at 2-5.


    **C.    Analysis**

    Timken 1998, 22 CIT at 625-26, 16 F. Supp. 2d at 1106, and

Micron Tech., Inc. v. United States, 23 CIT 208, 210-12, 40 F.

Supp. 2d 481, 483-85 (1999), aff'd, 243 F.3d 1301, 1314 (Fed. Cir.

2001), explain the validity of Commerce's practice of limiting

United States indirect selling expenses to those expenses incurred

in the United States.  See NTN Bearing Corp. of Am. v. United

States, 26 CIT __, __, 186 F. Supp. 2d 1257, 1320-22 (2002).

Neither the pre-URAA statute nor the newly-amended statute address

whether United States indirect selling expenses incurred outside

the United States should be categorized as United States indirect

selling expenses.  See Timken 1998, 22 CIT at 625-26, 16 F. Supp.

2d at 1106; Micron Tech., 23 CIT at 212, 40 F. Supp. 2d at 485.


    Because Commerce's practice of limiting United States indirect

selling expenses to those expenses incurred in the United States

and the parties' arguments are practically identical to those

presented in Timken 1998 and Micron Tech., the Court adheres to its

reasoning in Timken 1998 and Micron Tech.  Accordingly, the Court

finds that Commerce's decision to limit United States indirect

selling expenses to those expenses incurred in the United States is

supported by substantial evidence and is in accordance with law.

## II.  NTN's Exclusion of Certain Expenses for Non-Scope Merchandise From United States Selling Expenses

### A. Background

In the underlying review, NTN excluded certain expenses attributable to non-scope merchandise from its reported United States indirect selling expenses.  See NTN's Resp. at 5.  In particular,

> [b]ecause certain of NTN's U.S. expenses were incurred solely for non-scope merchandise, in order to ensure an accurate allocation of its U.S. expenses, NTN first removed all such expenses from the pool of U.S. [indirect selling expenses]. . . .   The remaining U.S. [indirect selling expenses] which were incurred for either scope or non-scope merchandise, but which could not be specifically tied to either scope or non-scope products, were then allocated to scope and non-scope merchandise.

Final Results, 63 Fed. Reg. at 63,867.

In accepting NTN's methodology of reporting its United States indirect selling expenses, Commerce: (1) stated that in past TRB and antifriction bearing ("AFB") cases, it has verified NTN's methodology and has found it to be reasonable; and (2) determined that

> NTN's approach for adjusting its U.S. [indirect selling expenses] remains unchanged for the current review, and there is no information on the record of this review which should call into question [Commerce's] practice of accepting NTN's approach . . . .

Id.

Commerce also explained how it eliminated the possibility of distortion in NTN's methodology when

> Commerce calculated a ratio of sales of scope merchandise to all sales. . . . Commerce . . . adjusted NTN's reported final indirect selling expense by adding or subtracting various expenses to arrive at a final indirect selling expense. Next, Commerce multiplied that total expense by the ratio of scope-to-total products.

Def.'s Mem. at 13 (citing Def.'s Proprietary Ex. 2).

## B.    Contentions of the Parties

Timken argues that Commerce improperly permitted NTN to exclude certain expenses attributable to non-scope merchandise from NTN's reported United States indirect selling expenses.[5]

---

[5] Timken asserts that the record does not support Commerce's conclusion that "'certain of NTN's U.S. expenses were incurred solely for non-scope merchandise.'" Timken's Mem. at 13 (quoting Final Results, 63 Fed. Reg. at 63,867); see also Timken's Mem. at 6-7, 13 (proprietary version); Timken's Reply at 4-5, 8 (proprietary version). In particular, Timken argues that a pertinent financial statement indicates that a relevant company was reimbursed by other companies for the certain expenses at issue. See Timken's Mem. at 13 (proprietary version). NTN maintains that "this conclusion simply does not follow from the [weight of the] stated facts." NTN's Resp. at 6. The Court will not entertain this argument because the Court's "role is limited to deciding whether [Commerce's] decision is unsupported by substantial evidence on the record, or otherwise not in accordance with law." Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 936 (Fed. Cir. 1984) (emphasis supplied); see also American Spring Wire, 8 CIT at 22, 590 F. Supp. at 1276 ("[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo'") (quoting Penntech Papers, 706 F.2d at 22-23 (quoting, in turn, Universal Camera, 340 U.S. at 488)).

See Timken's Mem. at 6-7, 13-15 (proprietary version); Timken's Reply at 4-8 (proprietary version); Final Results, 63 Fed. Reg. at 63,867. In particular, Timken asserts that NTN's adjustment of its allocated pool of indirect United States selling expenses "was unreasonable, resulted in distorted allocations, and was not supported by substantial evidence" because NTN excluded certain expenses attributable to the non-scope merchandise for one of its subsidiaries and then allocated the remaining expenses to all of NTN's scope and non-scope United States sales. Timken's Reply at 8; see Timken's Mem. at 13-14 (proprietary version). Timken also maintains its assertion that one of NTN's subsidiaries' certain "expenses attributed to non-scope merchandise is disproportionate to the amount of non-scope sales . . . is not mere conjecture" as Commerce maintains.[6] Timken's Reply at 7 (proprietary version).

Commerce responds that 19 U.S.C. § 1677a(d)(1994), "as amended by the URAA, continues to be silent on the question of allocation methods[,]" thus granting Commerce a substantial right of interpretation. Def.'s Mem. at 11. Commerce also points out that it "has verified the method used by NTN . . . on several occasions without [observing any] discrepancy." Id. at 12 (citing Final

---

[6] Commerce asserts that the "record does not show what non-scope merchandise was stored in the warehouse at issue." Def.'s Mem. at 13. Therefore, the Court agrees with Commerce that it is "impossible to say whether the storage charges are disproportionate to the sales of the non-scope merchandise." Id.

Results of Antidumping Duty Administrative Reviews and Termination in Part of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 63 Fed. Reg. 20,585, 20,595 (Apr. 27, 1998); Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 63 Fed. Reg. 2558, 2572 (Jan. 15, 1998); and Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 58 Fed. Reg. 64,720, 64,726 (Dec. 9, 1993)). Commerce further states that it eliminated the possibility of distortion in NTN's methodology when Commerce: (1) calculated a pertinent ratio; (2) "adjusted NTN's reported final indirect selling expense"; and (3) "multiplied that total expense by the ratio of scope-to-total products." Def.'s Mem. at 13.

NTN supports Commerce's conclusion. Replying to Timken's claim that "Commerce accepted a reporting methodology for certain U.S. indirect selling expenses which caused a distortion in NTN's reported expenses[,]" NTN's Resp. at 5 (citing Timken's Mem. at 6-

7, 13-15), NTN contends that "[t]he sole basis for [Timken's] . . . claim is a hypothetical concocted by Timken which is not factually similar to the case before the Court."[7]  NTN's Resp. at 6.  NTN maintains that its allocation methodology is not distortive and "Commerce's decision to accept NTN's reported pool of allocated expenses for U.S. indirect selling expenses is reasonable, and in accordance with law. . . ."  Id. at 5.


### C.    Analysis

The Court upholds Commerce's decision to allow NTN to exclude certain expenses attributable to non-scope merchandise from its United States selling expenses since it is in accordance with law. The Court notes that 19 U.S.C. § 1677a(d) is silent on the question of allocation methods and thus grants Commerce considerable discretion.  Under 19 C.F.R. § 351.401(g)(1998),

> [Commerce] may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided [Commerce] is satisfied that the allocation method used does not cause inaccuracies or distortions.

In addition, pursuant to 19 C.F.R. § 351.401(g)(4),

---

[7] To illustrate its contention that NTN's exclusion of certain expenses attributable to non-scope merchandise from NTN's United States selling expenses is distortive, Timken provides hypothetical examples.  See Timken's Mem. at 14 (proprietary version); Timken's Reply at 6-7 (proprietary version).  The Court is not persuaded by Timken's hypotheticals since Timken fails to use evidence on the record to illustrate that NTN's allocation methodology was distortive.

[Commerce] will not reject an allocation method solely because the method includes expenses incurred, or price adjustments made, with respect to sales of merchandise that does not constitute subject merchandise or a foreign like product (whichever is applicable).

Based on a careful examination of the record and on the regulatory language of 19 C.F.R. § 351.401(g) and (g)(4) that grants Commerce considerable discretion in choosing allocation methods, the Court sustains Commerce's decision to accept NTN's United States selling expenses as reasonable, supported by substantial evidence and in accordance with law.  See Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944).

## III. Commerce's Granting of a Level of Trade Adjustment for EP Sales

### A.    Background

#### 1.    Statutory Background

The URAA contains a specific provision regarding adjustments to normal value ("NV") for differences in levels of trade.  The statute provides for NV to be based on:

the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price.

19 U.S.C. § 1677b(a)(1)(B)(i)(1994) (emphasis supplied).  The statute also provides for an LOT adjustment to NV under the

following conditions:

> The price described in [§ 1677b(a)(1)(B)(1994),
> i.e., NV,] shall also be increased or decreased to make
> due allowance for any difference (or lack thereof)
> between the export price or constructed export price and
> the price described in [§ 1677b(a)(1)(B)] (other than a
> difference for which allowance is otherwise made under [§
> 1677b(a)(1994)]) that is shown to be wholly or partly due
> to a difference in level of trade between the export
> price or constructed export price and normal value, if
> the difference in level of trade--
>
> > (i) involves the performance of different selling
> > activities; and
> > (ii) is demonstrated to affect price comparability,
> > based on a pattern of consistent price differences
> > between sales at different levels of trade in the
> > country in which normal value is determined.
>
> In a case described in the preceding sentence, the amount
> of the adjustment shall be based on the price differences
> between the two levels of trade in the country in which
> normal value is determined.

19 U.S.C. § 1677b(a)(7)(A).


In sum, to qualify for an LOT adjustment to NV, a party has

the burden to show that the following two conditions have been

satisfied: (1) the difference in LOT involves the performance of

different selling activities; and (2) the difference affects price

comparability.  See SAA, H.R. Doc. 103-316, at 829 (stating that

"if a respondent claims [an LOT] adjustment to decrease normal

value, as with all adjustments which benefit a responding firm, the

respondent must demonstrate the appropriateness of such

adjustment"); see also NSK Ltd. v. United States, 190 F.3d 1321,

1330 (Fed. Cir. 1999) (noting that a respondent bears the burden of

establishing entitlement to an LOT adjustment).

### 2. Factual Background

During this review, Commerce applied the following LOT methodology. See Final Results, 63 Fed. Reg. at 63,868-69; Preliminary Results, 63 Fed. Reg. at 37,347-48. In accordance with 19 U.S.C. § 1677b(a)(1)(B)(i), Commerce first calculates NV based on exporting-country (or third-country) sales, to the extent practicable, at the same LOT as the United States (EP and CEP) sales. See Final Results, 63 Fed. Reg. at 63,868. "When [Commerce is] unable to find comparison sales at the same LOT as the EP or CEP sales, [it] compare[s] the [United States] sales to sales at a different LOT in the comparison [home or third-country] market. Id.

With respect to the LOT methodology for EP sales, Commerce first calculates EP "on the basis of the starting prices of sales to the United States." Id. "Where home market prices serve[] as the basis of NV, [Commerce] determine[s] the NV LOT based on starting prices in the NV market." Id.

Commerce then proceeds to determine whether sales in the home market exist that are at the same LOT as the EP sales. In making such a determination, Commerce examines whether the home market sales are at different stages in the marketing process than EP or

CEP, that is, Commerce "review[s] and compare[s] distribution systems, including selling functions, classes of customer, and the extent and level of selling expenses for each claimed LOT." Final Results, 63 Fed. Reg. at 63,868. If the EP sales and the NV sales are at a different LOT, and the differences in LOT affect price comparability, as manifested in a pattern of consistent price differences between the sales on which NV is based and comparison-market sales at the equivalent LOT of the export transaction, Commerce will make an LOT adjustment pursuant to 19 U.S.C. § 1677b(a)(7)(A). See id. at 63,869. If there is no pattern of consistent price differences, no adjustment is made. See id.

Applying this methodology, Commerce determined that for NTN

there were three home market LOTs and two (one EP and one CEP) LOTs in the United States. Because there were no home market LOTs equivalent to NTN's CEP LOT, and because NV for NTN represented a price more remote from the factory than the CEP, [Commerce] made a CEP offset adjustment to NV in [Commerce's] CEP comparisons. [Commerce] also determined that NTN's EP LOT was equivalent to one of its LOTs in the home market. Because [Commerce] determined that there was a pattern of consistent price differences due to differences in LOTs, [Commerce] made a LOT adjustment to NV for NTN in [Commerce's] EP comparisons where the [United States] EP sale matched to a home market sale at a different LOT.

Id. at 63,869.

Moreover, in the Final Results, Commerce observed that,

[a]s stated in [Final Results of Antidumping Duty Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From

France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 63 Fed. Reg. 33,320, 33,331 (June 18, 1998)], differences in selling functions, even substantial ones, are not alone sufficient to establish a difference in LOTs. While there are a few individual selling functions that vary, [Commerce] determine[s] that these functions, by themselves, do not offset the many similarities of the selling functions performed by the respondent at the EP and home market LOTs. Although [Commerce] ha[s] determined that there is a qualitatively minimal difference in selling functions between one of the home market LOTs and the EP Lot, the two LOTs are similar enough to be considered the same LOT, such that that home market LOT can be used in determining whether there is a pattern of consistent price differences between that LOT and the LOT at which certain EP sales are made.

Id.


B.    **Contentions of the Parties**

Timken contends that Commerce improperly granted NTN an LOT adjustment under § 1677b(a)(7)(A) for EP sales. See Timken's Mem. at 7-8, 15-16.  In particular, Timken maintains that the LOT adjustment under § 1677b(a)(7)(A) "presumes . . . that there exists a home market level of trade that is comparable to a U.S. level of trade."  Timken's Reply at 9.  Timken argues that since: (1) "[t]he record does not demonstrate that price differences between NTN's home market sales at different levels of trade affect their comparability to NTN's U.S. EP sales," Timken's Mem. at 16; and (2) "[t]here is no demonstration that the EP sales are at a level of trade that is comparable to sales at any level of trade in the home market," id., "there is no basis in the record for Commerce to

calculate a LOT adjustment for NTN's EP sales."  Timken's Reply at 11.

Commerce responds that it properly granted an LOT adjustment for NTN's EP sales.  See Def.'s Mem. at 14-16.  Commerce notes that pursuant to § 1677b(a)(7)(A) Commerce

> determines that sales are made at different LOTs if they are made at different marketing stages (or the equivalent).  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.  Some overlap in selling activities will not preclude a determination that two sales are at different stages of marketing.

Id. at 15-16 (quoting 19 C.F.R. § 551.412(c)(2) [sic]).[8]

Commerce maintains that it acted in accordance with 19 U.S.C. § 1677b(a)(7)(A) and 19 C.F.R. § 351.412(c)(2) when Commerce determined that: (1) "the differences in selling activities ('functions,') . . . between the equivalent [home market] LOT and EP LOT were minimal"; and (2) "Commerce used the [home market] LOT to determine whether there was a pattern of consistent price differences between that LOT and the LOT at which certain sales [were] made."  Def.'s Mem. at 16.

NTN generally agrees with Commerce and maintains that "[b]ecause the law and the record support matching these levels of

---

[8]  The Court assumes that the correct citation is 19 C.F.R. § 351.412 (c)(2)(1998).

trade [that is, NTN's home market LOT and NTN'S United States EP LOT] for comparison purposes," Commerce's granting of the LOT adjustment is not unreasonable because there are "sales functions [that] are performed for United States EP sales which are not performed in the home market." NTN's Resp. at 7-8.

### C.   Analysis

The Court disagrees with Timken that Commerce improperly granted NTN an LOT adjustment under § 1677b(a)(7)(A) for EP sales. "In the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable." Timken Co. v. United States, 23 CIT 509, 516, 59 F. Supp. 2d 1371, 1377 (1999); see also Chevron, 467 U.S. at 844-45.

During the review at issue, Commerce determined that NTN's EP LOT was equivalent to NTN's home market LOT. See Final Results, 63 Fed. Reg. at 63,869. In granting NTN an LOT adjustment pursuant to § 1677b(a)(7)(A), Commerce determined that the equivalent home market LOT and EP LOT had minimal differences in selling activities and "determined that there was a pattern of consistent price differences due to differences in LOTs." Id.

Although "zero" differences in selling functions (that is, a perfect comparison) between the home market LOT and EP LOT would make the two LOTs perfectly comparable, the Court finds that §

1677b(a)(7)(A) grants Commerce discretion to find the necessary degree of comparability in situations where differences are de minimus.

Accordingly, the Court sustains Commerce's decision to grant NTN an LOT adjustment for EP as reasonable, in accordance with law and supported by substantial evidence.


## CONCLUSION

The Court finds that Commerce acted properly in: (1) refusing to adjust CEP for indirect selling expenses reported by Koyo and NTN; (2) permitting NTN to exclude certain expenses attributable to non-scope merchandise from NTN's reported United States indirect selling expenses; and (3) granting NTN an LOT adjustment for EP sales. Commerce's determination is affirmed.


_____
NICHOLAS TSOUCALAS
SENIOR JUDGE



Dated:     June 5, 2002
           New York, New York